May it please the court, James A. Hennifer on behalf of the plaintiffs and appellants in this matter. I will address the RICO issue first and then briefly the antitrust matters and then reserve five minutes if I can do all of that in my 20 minutes. While the district court did not address or decide the issue of the predicate acts, the racketeering, the enterprise, it is important to remember what these acts are in this particular case. While this is not a ramparts case like Diaz was, it was a pretty widespread and pretty blatant fraud which used the males. Counsel, that sort of assumes what is to be proved. Let me tell you what my problem is with your theory so that you can educate me out of it. It looks to me as though what you're complaining about is it's really hard to compete with these people because what they sell is a deal where you get your copy of your machine plus you get service and supplies for several years. And that means for several years you won't be a customer for anyone else. Well, the RICO theory is that there's puffing that rises to the level of fraud in encouraging people to take this deal, I think. And the antitrust theory is that it interferes with competition. And I'm having trouble seeing that because it looks to me just like anybody else's warranty or extended service warranty like you get at Sears. And they also try to talk you into getting a warranty on all your Sears products. Every merchant does that. You go and buy a $20 item at Brookstone and they try to talk you into an extended warranty. You buy a good car and it has a warranty on it, which means you don't go to the independent garages. And I'm having trouble seeing where anything goes beyond the ordinary puffing of how great the service is. With due respect, Judge Kleinfeld, that's not even close. The better example would be you lease a car on a fully amortized lease for five years. You come in at the end of five years and they say, you're not fully amortized. You've got to pay the full cost of this car over another five years because we put a new tire on the car one day before the five years expired. That's an entirely different deal. What they do is, and I'll give you a perfect example of this, the California Nurses Association has 10 or 15 copiers. They come in toward the end of the five years. They say, we'll give you a free fax machine. Just sign this one little form. And it has 60 months and they're trained to say that 60 months means your fax machine is for 60 months. You can have it for 60 months. When it really means all of your copiers have just been rolled over and you're going to pay for them twice for another 60 months. That's an entirely different deal than a warranty. Doesn't it say right in writing there that your existing copiers are covered as well as your fax? Exactly wrong. That used to be in the language. They took it out. And when salesmen complained that customers were being deceived, they said, we're not going to put that back in because our manual wants the customer to understand that they're not being changed, that it's not being extended because if we can get this extension, we can hold them over a barrel at the end of the five-year period and we can play off this huge payment, which is a double payment for the equipment and all the unused service. They want to cancel at that time. We're going to bill them for all of the gross revenues of the unused service. And when we got them over that barrel, they can't go to the competitor unless the competitor wants to make a big payoff to get into this. So you have no problem with them selling you a copier deal where you pay so much per page and for five years and they take care of your copier? No problem whatsoever, Your Honor. Your problem is just to the renewal. Just in the renewal. And that's what the defendants have tried to do, confuse the issue of the primary market where I'm buying new copiers and I don't have a problem. That's a free and competitive market. You can negotiate your deals up front. What I have a problem with is the renewals when they deceptively, they wrote a manual that says here's how you do it. You tell the customer if he asks what the 60 months means, it means that's the period of the new machine or that's the period of the new machine we're replacing. You don't tell them this for all of the equipment. Don't even bring the lease with you when you come to see the customer because we don't want to refer to the original lease. Now, where do I find this exactly? It's in the first amended complaint, Your Honor. And it's described under the section that says unfair business practices. Okay. One problem you have with a record like this, if you're a judge, is there just too much of it. The first amended complaint is ER 196 to 287. I will give you the paper. So tell me. Unfair business practices. Here we go. It begins at ER 202 through 204 is the summary description of that, Your Honor. Well, with respect to the antitrust claims, I gather that you're claiming there are two markets. There's a primary market and there's the aftermarket. And they're completely distinct. Yes. Your opponents, as I understand their argument, they argue that there's really just one market that's contractually bound. Is resolution of that a question of law or fact? It's a question of fact. I mean, as the Supreme Court said in Kodak, when you're looking at relevant markets, it's highly case-specific and highly factual. And what we have here is something that all of the indicia point to a separate relevant market being these people in these aftermarkets that are caught by surprise, don't know going in in a competitive market that they're going to get this additional five years or several years tacked on to their contract and be asked to pay for them in a lump sum. And what happens to them there is they're in the position where they have to pay 50 to 100 percent more in order to get a competitor's equipment than they do to renew with ICON or GE. I've got to sort some things out here. Yes. If they're being unfair to their customers, that's not something that a competitor has the standing to challenge, I don't believe. And when you say fraud, as you do at page 202, you say two things, market imperfections, which is, I don't know if that's actionable at all. And you also say fraudulent and anti-competitive acts and practices. Now, anti-competitive acts and practices, that's different from fraud. Yes. Fraud is covered by Federal Rule of Civil Procedure 9. It has to be pled with particularity. Yes. And I'm having trouble figuring out exactly what the fraud is supposed to be. Okay. There are several elements of fraud, Your Honor. I don't mean just discursively. I mean where I can read it in the amended complaint. Well, you want me to point you to the pages in the record, I guess. That's right. A lot of stuff on 12b-6 is either 12b-6 because we read the complaint liberally, but not fraud. I understand, Your Honor. It starts at ER 219, describes the practices in detail, starting at 219, and continues through. Okay. The first one is ICON represented that it's contract allowed flexibility. To me, that just seemed like puffing. Right. It's like saying this is a good car. I couldn't see where it could be a false statement. The next one said that it would last for 60 months. And your own explanation does not seem to say that that was false. It seems to say that a lot of the contracts or most of them were renewed. And then the next one says that the contract was designed to meet the customer's needs. Okay. And that's like saying it's a great car. And then the next one says customer would fully amortize it except for a little bit of market residual value over 60 months. It seems like the same thing, and that because it had a captive leasing company, there would be no arguments as when you get an independent third company's extended warranty. I'm having trouble seeing exactly what the false statement that induced reasonable reliance to the detriment of the person that heard the false statement is. Yes. Judge Kleinfeld, there are a series of false statements. If I say to you up front that I am going to give you a 60-month contract and we're going to be flexible, if I give you a free fax machine or if I adjust the volume or the cost or if I replace a machine that's gone bad, it won't affect a thing. That's a lie, because when you sign an amendment for any one of those issues, the amendment form rolls you over on all the equipment you own for a renewed 60-month period to pay for the equipment again and for the service. Now, fraud can certainly be not telling material facts that are relevant. I'm looking for the false statement. The false statement is that the flexibility won't hurt you. We're not going to hurt you on the flexibility. Okay. That's the first one. Where is that now? I'm just looking at paragraph 62A for that. It starts in 65. It shows what they do when they amend. Amending the original icon contract flexing. ER-220? Why does that make it a false statement? I read that as just meaning they try to talk customers into extending their warranties. It's not. But I didn't see where that made a lie out of the original warranty deal. Well, what they tell you originally is we will be flexible. We'll adjust your copies, number of copies, minimums. We'll adjust your cost per copy. We'll adjust the equipment you can have. We'll replace bad equipment. And it won't hurt you. And, in fact, every time they do that, they are signing you up for another five months on this amendment. I see that you're talking here about the training where ICON trains its sales representatives. But I don't see where anyone has lied to a customer, in paragraph 65 anyway. You would not consider it a lie, Judge Kleinfeld, if somebody told you it won't cost you anything more for extending your warranty and it doubles the price? That's not considered a lie? How could I believe they'd give me an extended warranty for free? I mean, I got an extended warranty on my Sears refrigerator and freezer and all that stuff. I know what it would cost, right? Well, that's what they're telling people. Okay. It gets worse than that. So when they design this form on which you sign up for another 60 months every time you make a small change, which is the ICON amendment form described in ER-221, they took the language out of it that described to the customer that if you sign this form, you're going to sign up for all of the equipment you have with us for another 60 months. And the customers didn't understand this, and the salesman said, you know, we have customers that are in for a big surprise. They have no idea. ICON left the explanatory language out. It gets worse than that because they have a training manual, Your Honor, that says don't tell the customers what's going on because we can get a big buyout payment at the end of the period. We can keep the competitors out because they'll have to make this big buyout. If asked to look at paragraph 73, for example, they were trained to ask what the term 60 months meant when it was filled out with a 60. ICON salesperson were trained to state that it was the term of the original agreement. It isn't the term of the original agreement. It's your new amended term that you might have to pay. Do you have a customer here who says they lied to me, they said this, and the truth was that? Yes. I mean, I've spoken with 400 around the country, Your Honor, who have said I had no idea. They told me that this was a free, the California Nurses Association, that this was a free vaccine. It seems like what you're doing here is telling me they trained their salespeople to either lie or puff, depending on how you interpret it. But I'm looking for where customers lied to and deceived. Yeah. They have a training manual that says this is what you do and this is how you get the customer to sign this by not telling them the truth. I consider not telling the truth a lie. I consider telling something that's a half-truth and doesn't explain it as a fraud. I think 73 is closest you get to an affirmative misrepresentation in your complaint, isn't it, as opposed to omissions and efforts to disguise the true meaning of the extension? I mean, 73, if they say 16 months, tell them it's the original term, and, of course, it's not the original term. That's the one. We're just talking about the original extension here. Yeah. As it comes to the end of the period, there are several other things that I would consider a fraud. The contracts when they're originally signed or the amendments when they're signed say this 16 months or the period of this will run from the time the customer signs it. And they don't run it from the time the customer signs it. They'll wait eight or nine months to sign it back at headquarters, and they'll run it for 68 or 69 months. It says on the face of it from when the customer signs it. Are you saying the customer gets a better deal than he's supposed to? No, he's got to pay eight or nine months more. Oh, he pays eight or nine months more? Would you like to pay eight or nine more months on your home mortgage when you thought it was over or on your car lease? Actually, on my car warranty, if instead of being a five-year warranty or whatever it is, if it was a five-year and eight-month warranty, I'd be delighted. But here's the problem. You're talking warranty, which is something they give you. I'm talking payments you have to make. And if you don't make them. Well, nothing's for free. It's like when you go into a store and they say buy one, the second one is free. Well, you could look at it as free if you want, or you could look at it as two for the price of one and each is half price. Well, this is not a warranty, Your Honor. This is an obligation by a customer to pay for equipment and service that are bundled, service parts and supplies except for paper. And what a customer ends up with, and I've seen this again and again, is at the end of the 60-month period, they're left with machines that are outdated and worn and breaking down a great deal. And they say, good, I'm going to go out into the primary market and I'm going to get competitive bids. And ICON and GE come in and say, we're sorry. You owe us another 60 months of payments. And they say, well, wait a minute. Where did that happen? Well, it's this amendment you signed. You see that 60 there when we adjusted it a little bit when we were flexible? You owe us another 60 months of payments. For all of this equipment that's useless, you owe us another 60 months of payments for service. Now we're getting down to the meat. Where is that in the amended complaint? It's in the paragraph. And we have basically, Your Honor, look at paragraph starting at 88. Paragraph 88 on ER-228, we have examples of the specific representations that were made to 1, 2, 3, 4, 5, 6, 7, 8. Eight customers, and we've listed the specific types of misrepresentations or omissions that were made by ICON and GE to these people. And I haven't finished with them, Your Honor. When they come to the end of the period, they then say you are obliged to make a payment of X dollars. So what you're saying is at the end of the period, they lie and trick the customer into signing 60-month renewal on his obsolete copier? During the period, any time during the period. And they're trained not to bring the original agreement in because they don't want to refer to the original agreement. They leave that blank when the customer signs it oftentimes, and then they type it in later because they don't want to refer to it. They tell the customer, and he says, what does the 60 mean? Well, that's only for this piece of equipment we're giving you now. Let me ask you a slightly different question on the antitrust claims. What is your – I'm not sure I quite understand your theory against GE completely. And it's not – they're not dealt with separately in the briefs, and the district court didn't focus on it separately. But is your claim that they have some derivative liability because they acquired these accounts, the sales, or are you claiming that GE affirmatively participated in the alleged misrepresentations? Starting in March of 2004, GE bought the financing arm of ICON, which makes the demands based upon these contracts. And as GE well knows, the original contract was a 60-month contract. They're making demands that push the period out to 80 months, 100 months, or 100 to 10 months. That's my question. I mean, you don't allege here that GE participated in the original misrepresentations at all, right? Not in the original ones, but in the enforcement of them and obtaining new contracts from these people by the threat of this huge buyout or litigation, which makes our people pay money and forecloses us from the market. And we've given specific examples. When you say makes our people pay money, I thought you didn't represent any of the people that pay money. I thought you represented a competitor. The competitors paid money. We have specific allegations in here. We have listed, and I'll give you the paragraph in the First Amendment complaint, we have listed specific payments made by the plaintiffs in this case, cash out-of-pocket paid by plaintiffs in this case for these extended demands based upon the frauds. They are at paragraph 161ER251, time, date, and place. There are seven of them paid to ICON. There are two paid to General Electric. We haven't gotten to Diaz. That's the property. I assume cash is property, the damage. I mean, certainly even Oscar says that. Wait a minute. This says the payments made to ICON and GE. By plaintiffs. They were made by plaintiffs. This was cash out-of-their-pocket. There's the property damage, injured in their business or property, since I haven't gotten to Diaz yet. Under your theory, who's exercising market power, GE, ICON, or both? They both are. I mean, if you look at what market power is, it's the ability to keep somebody out of a competitive market, the ability to limit their substitutes. What can they substitute for this ICON equipment that's worn out at the end of 60 months? And if they have to pay 50% or 100% more than they would for competitive equipment from one of the competitors, is that a substitute product for them? It isn't. Because substitutability depends upon price, qualities, and uses. And price is critical. If you double the price, it's not a substitutable product. It's not as simple as cellophane in the DuPont case, but there's where we are on that. Back on 161, it says these are the payments by plaintiffs. And then I look down the list of payments, and I don't see a plaintiff's name, unless I missed it. Which one is it? It looks like the plaintiffs are Newcal, Pinnacle, Pacific Office, and Kearns. Is one of those in this list? I don't see it. No. These were the entity with the fixed contract. Yeah, but you said payments by plaintiffs. They were made. Each one of these were made by one of the plaintiffs. They're not listed. Newcal or Pinnacle or Pacific Office or Kearns? Those are the plaintiffs. They're not in the list. They were not there. But it is alleged they were made by plaintiffs. And it's true. We can get a cancel. The allegation is expanded to here, to list the plaintiffs or the people that made the payments and the dates and the amounts paid, and none of them were plaintiffs. It does not say that the entity on the left-hand side there, Judge Kleinfeld, is the one that made the payment. The plaintiffs made these payments on the entity with the flex contract. In other words, one of the plaintiffs, and certainly it's alleged the plaintiffs are not listed. I didn't understand what you just said. Did the plaintiffs here, Newcal, Pinnacle, Pacific and Kearns, did any of them pay money to ICON? Answer, yes. It says that in there. Are they listed here? No. I think what you're saying is that they made payments on behalf of the listed entities. Right. But you didn't in the allegations of the complaint. Right. You didn't say that. It says the payments were made by plaintiffs. Do you mean that ICON or rather that Newcal or somebody volunteered to pay Delaney-Mitchell's bill? Yes. And wrote a check for $23,122. Absolutely. Well, if Newcal volunteered to pay Delaney-Mitchell's bill, wouldn't they just be a volunteer because they weren't obligated to pay Delaney-Mitchell's bill? Well, they have to pay that bill if they want to get into that account. That's the price of admission. That's the, in addition to a competitive lease, they have to pay this at the end. Does it say that that's what you mean here, that the plaintiffs voluntarily paid these people's bills in order to induce these people to switch over to ICON? It says the payments were made to ICON and GE on flexed contracts by plaintiffs. I mean, I'm sorry I didn't list each plaintiff. It's not there. You're right. Well, we've gone over time because the case is so complex, but I know I've asked a lot of the questions and taken your time. If my colleagues have more questions, we'll continue. Well, why don't we wait? Judge Thomas had a question on the antitrust, which is not related. I just wanted to expand on your answer. Thank you, counsel. Although your time is exhausted, I plan on taking a minute or two for rebuttal. Okay. Thank you very much. I'll try to make sure that you can hear me. Good morning. Holly House on behalf of the defendant ICON. I am also speaking on behalf of GE, but GE counsel wants to reserve five minutes in case you do have questions specific to the GE defendant. Do you want to divide it up, then? That's the best way we could figure it out. Could you save five minutes for GE and cut five minutes off this attorney's argument? Your Honors, this is not a Federal case. The plaintiff alleged that their competitors, ICON and GE, mislead their customers in negotiations over amendments to the original contracts. I just want to warn you, the clerk was not able to cut you down to 14-9-19, so just quit with five minutes to go. I'll try. Okay. Obviously, the defendants disagree. We don't think there's fraud here either, Your Honor. But if ICON's competitors think ICON or its financing arm is using unfair competition or if its customers feel like they're being swindled, they have access to State law to bring those claims. There is no Federal case that is pled. Let me turn to the Sherman Act claims. The district court said that essentially those claims ought to be dismissed because under your theory that it's a matter of contract law and it's simply one market. Am I essentially correct using probably some colloquial phrases? Well, actually, there are four markets alleged. There's two primary markets which are essentially drawing a circle around ICON's customer install base and calling that a market. That is, as a matter of law, an inadequate market definition, and there are multiple cases that we have cited. Why is that? I missed that at a motion to dismiss stage. That is because if you think about it, that would make everybody who has an installed customer base a monopolist or subject to an antitrust violation. That's not what the antitrust laws are designed to protect against. What you have to look at in the way that all of the cases that we cited and the Tanaka case is an example that I know that Judge Kleinfeld is familiar with is you have to look at the time that the products that the customers can choose from, see whether the products are interchangeable, and then draw the market wide enough to include those products. You can't say that a customer base is equivalent to a product market definition. It just otherwise you end up having what is really a law of contract become the law of antitrust. And the antitrust laws are just concerned with a different kind of anticompetitive harm that has a bigger impact. Not to interrupt, but how do you distinguish Kodak? Because obviously you can take a single branded product and have a Sherman Act concerns if you have a separate aftermarket. Now here what they allege, as I understand it, in part, I realize that you're quite correct, they're alleged four different markets. But in part they're saying there's a derivative aftermarket that's tied to the brand, and that's the market they're concerned with. They're not interested in the primary market. They're not alleging that. Well, actually they are, but they don't make any market power at all allegations. And in that sense, I think those are off the table. Yes, I agree with you on that. There are many distinctions with Kodak. And the key one is you have to look at how Kodak did it right. The product interchangeability test was used in the Kodak case. It wasn't the contractual power over Kodak's installed customer base that was the basis for finding that the market was properly defined and that there was market power within that market. What they actually said in the Kodak case is because service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market is composed of only those companies that service Kodak machines. It was specifically looking at the product interchangeability and finding that it didn't exist, it was a unique brand. Those parts weren't available anywhere else. And that power over – Kodak's power over its own parts and its unwillingness to sell those to competitors was what gave it market power and allowed the market definition to be a single brand product. That is not what this case is about. This case is about – So Kodak is basically about restricting the market by not selling to part of it. Exactly. And it's you find the market because there's a unique demand for those products, and then you find the market power because of the control that Kodak had over those products. That's nothing like what's alleged here. Here all you have is somebody drawing a circle around an installed customer base when you don't have any allegations at all about the icon having any kind of power over – you know, there's multiple brands of equipment that they sell. There's multiple – they're just a distributor. There's multiple brands of service that they provide on different copies. There's multiple parts. Nobody's saying that only icon has access to parts or any of this. So none of that works. The whole unique quality of Kodak simply isn't present here. And there's absolutely nothing in that case that talks about Kodak's deriving any kind of market power from the contracts themselves. And insofar as there were market imperfections in the Kodak case, the whole idea of, gosh, the customers were locked in and they had trouble and they – you know, there's issues about whether or not they can assess switching costs. Those market imperfections are assessed against the market power that's properly defined. Let me see if I have this analogy right. You buy a BMW. You get BMW service for – and it's what they call free. Really, it's part of the price of the BMW at your BMW dealer. But it's inconvenient. You'd like to drop your car off in the morning on the way to work at a convenient garage. If BMW won't sell the garage, an oil filter, or an air cleaner, then it's looking for trouble under Kodak. There's a great big aftermarket. Hold on. Let me finish my question. But if BMW will sell the garage near your workplace, air filters and oil filters and all that stuff, and you just choose to go to BMW because basically you've already paid for your air filters and oil cleaners and the hours of time that it takes to install them, then there's no Kodak problem because BMW is merely servicing its customer base and has not restricted sales. Have I got the analogy right? You are right, sir. Absolutely. Do you think I ought to go into the RICO issue since you raised it and we have such a limited amount of time? Sorry? The RICO issue. Yeah, sure. I like your views of how Diaz fits. Well, one thing I'm sure Your Honors have realized is that there is the ANSA case that came down from the Supreme Court as well since the briefing on this. Yes, and we're waiting on Odom v. Microsoft, which is an en banc decision that should be out of our court shortly, too, that may have some implications as well. But Diaz is the only one that's on the book from our court right now. Right. But just so you understand, the RICO claim that we attacked, we attacked it on four fronts, and any one of those fronts gets rid of this claim. We attacked it on lack of proximate cause, lack of reliance on the predicate fraud, failure to allege a RICO enterprise, and lack of specificity. And the Diaz case raises another potential attack, which is the failure to adequately allege injury to the plaintiff's business or property. We don't think you have to get to that because any of the other four things that we've argued below and on appeal work. But I'm happy to talk to you about why, if we had brought that as another claim, we think it would have failed as well. The Diaz case, the Diaz case talks about the fact that if there's a conceptual property right that exists under the State law, then there is, in fact, an adequately alleged injury to business or property. What Diaz didn't do, and we think if we had argued below, we would have, would have been to say, okay, that's fine. There is a conceptual right to prospective economic advantage. It exists under California State law. The individuals listed in the RICO statement were California individuals, so that would be the State law that applies. However, what isn't in the complaint and can't be played in the complaint is the very specific requirements to state such a claim under California State law. And so because there are inadequate allegations to state that claim, even though there's a conceptual right that if it had been properly pled, would satisfy that element of the RICO claim, because it's not properly pled, you can't say you meet RICO by meeting the State claim if you don't actually meet the State claim from a pleading standard. So that would be the argument that we would make under the Diaz case. The ANSA case, just like the Holmes case, really takes care of this unproximate cause. As relying heavily on the Holmes decision, the Supreme Court held that a plaintiff had failed to state a RICO claim under the very same premises that these plaintiffs try, even though the plaintiff claimed the defendant's actions of failing to charge a customer's tax were allegedly done to give it a competitive advantage over the plaintiff. That's exactly what's being alleged here. If you look at FAC 160, which is in the complaint, the plaintiff is, quote, the plaintiff's competitors were the intended target of the alleged violations of 1962. They're saying the defrauding of the customers was done to hurt them. The ANSA case specifically rejects that reasoning. They said, quote, Which case? The ANSA case, which is the Supreme Court's decision last year, currently on point. They said, quote, We reject the Second Circuit's reasoning that because defendants allegedly sought to gain a competitive advantage over plaintiffs, it is immaterial whether they took an indirect route to reach that goal. What they said is, quote, When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries. And then they talk about the fact, and they concluded that the State of New York, not the plaintiff, was the, quote, direct victim of the alleged RICO tax fraud, and that plaintiff's claims injured claimed injury from defendants not charging the customers' taxes, and therefore making it cheaper to go with them, was too attenuated. And so that's exactly our situation here, that the predicate RICO fraud that's It's not a fraud on these competitors. And they are the victims under the ANSA analysis. And they were the ones who were being misled, not the plaintiffs. And it is the intervening act, as you pointed out, Judge Kleinfeld, it's the intervening act of the plaintiffs coming to the harm. They chose to voluntarily pay these buyouts. That's not, there's two different causes of their claimed damages. They chose to do it. That wasn't done to them. The obligation on the buyouts was not theirs. The obligation of the buyouts was the customers'. There's also all of the analyses that were present in Holmes were also reiterated in the ANSA case. The concern about how can you figure out whether or not these customers really would have, you know, gone with that plaintiff, you know. There's just too much attenuation between the lost plaintiffs and the predicate act under the Supreme Court cases. And finally, the Supreme Court cautioned, well, the proximate causation has particular resonance when applied to claims brought by economic competitors, which, if left unchecked, would blur the line between RICO and the antitrust laws. In RICO, the concern is properly for the direct victims of the alleged predicate act. The Sherman Act is there to protect competition, and it's available, if properly pled, to competitors to readjust their injuries. That cautioning language from the Supreme Court tells you that this is not a proper RICO claim under a proximate cause standard. But I also want to remind Your Honors, because there, frankly, was no response to it in the reply or below, that there just is no RICO enterprise alleged here either. So Odom's going to deal with that. So I think to the extent that it has any implications, we may have to get some supplemental briefing. But I think that will be out in a couple of weeks. Okay. There is also the question of reliance. This is another argument that we put forth below to deal with the RICO claim, and there are the Supreme Court in ANSA specifically deferred, did not decide the reliance question. But if you look at Justice Scalia's concurrence, he points out that he — it's absolutely, as he says, it's absolutely inconceivable that these plaintiffs, in that case a competitor, were in the zone of interest protected by the fraud statute of New York that was the predicate act statute. And that's something that Judge Easterbrook in the Seventh Circuit had also pointed out in his decision in the Israel travel case, which talks about, again, in the RICO case, you can't have somebody claiming he didn't get to actually rely on the fraud, bringing the fraud claim. That brings you out of the zone of interest for purposes of the RICO statute. And we've presented many cases that do, in fact, have a reliance requirement under RICO when obviously these plaintiffs do not claim to rely on any of the reported statements or omissions. And so that, again, is another basis, independently adequate for dismissing this RICO claim. The Lanham Act is the last of the Federal claims, and we don't believe that in any way is met here. The plaintiffs have their original complaint had literally half a page of allegations on the Lanham Act. Their first amendment complaint expanded it to all of one. The Lanham Act has much higher requirements for pleading than that. And ultimately, what they came up with in terms of the five statements that ICON purportedly made all fail to satisfy the requirements for RICO. But one of the ñ in part, the district court ñ as I recall what the district court said about the Lanham Act claim is that it ñ with respect to about, I think, two of the statements, they said the statements were true when made. I found that curious on a 12b6 dismissal. Well, if, as one of them is the 60 months, yes, it's true when made, and it's true as they've admitted in their allegations, that if we say that our contracts are going to be 60 months, well, that's what they admit is the standard length for contracts. So that's true when made. The statement that ICON would deliver 95 percent uptime service is a predictive statement. It's in the future. It can't be false at the time. It can only be false if you don't meet the 95 percent. The other concern here, and you'll look in the allegations, is that many of these are not alleged to be made in commercial advertisements or promotions. They're in one-off negotiations with customers that purportedly took place. Well, that's ñ maybe that customer has a fraud complaint, but that doesn't make this a Lanham Act violation. Again, this is not a Federal type of complaint. I have to let my co-counsel have it. You probably want to save a little time for counsel. Thank you, counsel. Good morning, Your Honors. My name is Hojun Huang. I represent General Electric Capital Corporation, one of the other defendants in the case. And as Judge Thomas pointed out in an earlier question, it's not clear what GE is doing in this case. I realize that you briefed jointly on the issues that were raised by the district court, but would you address GE's separate liability apart from what's been argued in the briefs? Right. Because I don't understand entirely the theory, and we heard some illumination today. And I can lie. That's a problem for these claims. GE is alleged to have acquired $1.9 billion in existing lease contracts from ICON in March of 2004. There's no allegation, and Mr. Hannaford conceded earlier today, that GE had anything to do with the origination of the contract. I took from his answer what he meant was that you had nothing to do with the original contract. You acquired some of the contracts later on along with that. But I also gathered that part of his allegations are that GE actually engaged in some of the contract redoubles. Is that your understanding of the complaint? Well, there are some allegations here that you could interpret that way, and that's one of the problems that raises a particular Rule 9 issue, especially with respect to the RICO claim, with respect to GE. That is, we administer the leases. I'm sorry. I missed a couple of words there. You are what? We administer the leases. We take payments. You mean you collect the money. Yes. We collect the money, and when customers call with questions about the terms such as how much is remaining, how many months are remaining, what is my – if I wanted to buy it out, how much is it? I think I get it. I think what you're saying is we don't sell anybody the copiers. We don't lie to anyone or tell anyone the truth when they're buying the deals. We just buy the paper from ICON, and then we collect the money from the customers and – We sometimes answer their questions. And that goes to the allegations – Part of collection. Allegations against GE. And they're drafted in this way. GE is alleged to have sent by wire and mail or telephone, quote, unquote, fraudulent documents to customers. Why are they fraudulent documents? They don't say what the documents said. They don't allege what the documents say or why they were fraudulent, why GE even had any basis to know they were fraudulent. They just say these documents were fraudulent because they were based on the fraudulent ICON flex. So what does that mean? Does it mean that GE is telling the correct information to customers under the terms of the contract, but it is false because it was induced by fraud in the first place? That could be one theory. Or is GE supposed to be making any independently fraudulent statements? Well, we don't know that. I mean, this – as drafted, this RICO claim clearly fails Rule 9. I would argue that it fails Rule 8. Would you address the antitrust claim? Sure. The problem with the antitrust market definition, and the reason why this isn't correct, is Mr. Hennifer is correct. You do look at interchangeable uses and substitutability of products in defining the relevant market. That's been the law since Brownshoe, and everybody agrees with that. And here, the only impediment to substitution that he is alleging are contractual restrictions. You can't – well, you can go on. But unlike the rest of the contractual restriction cases, this is a renewal rather than part of the original contract, for example, the original franchise. Is that a basis for a distinction in terms of a market analysis? No, because whether it's the contractual power is based on the amendment renewing the contract or in an original contract, it doesn't change the analysis. I mean, there was alleged fraud in the extension. But this Court has already stated that alleged fraud in the Tanaka case, alleged fraud doesn't transform an improper market into a relevant market. Here, the moment that customers sign up for the original contract, they have a restriction. They have an impediment to switching providers because, you know, they have to pay the contractual damages. Same thing occurs after they've extended the term. During the extended term, they have the exact same problem. And the source of that has nothing to do with product substitutability or any properly defined relevant market. The source of that impediment comes solely from contract. And that is a matter for contract law. With respect to GE's particular liability, I would say it's not. You've gone through your time, even adding a couple of minutes. So unless my colleagues have more questions, you should wrap it up in a sentence or two. On the Lanham Act question, given that GE is administrating contracts sold by somebody else, there's no commercial, there's no advertising or promotion. These are all one-off individual discussions with existing customers. So that's an independent reason why the Lanham Act claim fails with respect to GE. Thank you. Thank you, counsel. Please, Your Honor. Just three quick points, Your Honor. One, ANSA clearly is not applicable because the fraud there was a fraud on the State of New York. They were not collecting taxes and reporting false taxes and thereby taking money  away. The claim by a competitor was they had to be using that money somehow to make lower prices. Here we have a situation, if you look at ER 214, paragraph 45, where ICON's own internal document called Image Management Plus Flex Program Field Training Manual says we want to stem the contracts, make a big buyout, and we want to do that because it will cost our competitors a lot of money and keep them away from this customer. I mean, there's no more direct targeting information in their own written words than you can find in this case. You don't see it in any case. So this concept that they weren't targeting and that there's a discontinue between this whole program of flexing and making false demands, which GE did, this idea that they didn't make false demands, they took these extended contracts. I thought it wasn't about targeting. It was about direct versus indirect harm. I'm sorry? I thought that the Supreme Court case was not about targeting, but rather about direct versus indirect harm. If you will, foreseeability under Paul's graph, how much more foreseeable is something than if you predict it and it occurs? I mean, it's not only foreseeable, it's predicted. So, I mean, this falls under Paul's graph. Foreseeable that if you don't charge your customers sales tax, you'll be able to sell cheaper and undercut your competitors who do. They didn't put that in writing and say we're targeting national, we're targeting ideal steel because we're going to save money and we're going to lower our prices and we're going to put them out of business. It might have been a different case. But there's nothing like that in the record. And there's a discontinue. There's nothing to connect the two. We have in writing connecting of the harm done to the customers and keeping the competitor out of the market. Now, on the antitrust issue, which is my second point, very quickly, substitutability means what products can I go to if on renewal as an ICON customer I want to substitute. What we have here are three facts that are alleged very specifically and have been carefully calculated that that customer, if he wants to go somewhere besides ICON, has to pay 50 to 100 percent more for the same equipment. That that customer, 80 percent of those customers won't pay it, won't even make that move, and that they will have to pay, in a small case, up to $100,000 for equipment worth $1,000 to $2,000 to buy it out. These are all commercial customers. Yes, right, commercial customers. Now, what's wrong with that? Does that mean that these people have no market power being used? None of these deals are with individual households. It's basically commercial businesses. Commercial businesses, that's correct, Your Honor. Now, under any standard, the Department of Justice guidelines, where they say you have to take a group of customers and see what their reasonable alternatives are, given price, suitability, and uses. And price here is a critical issue. The other thing they say is if you have, and the case law says this, the cases they cite say this, if you have a situation where there's price discrimination, a new customer for ICON gets a deal at $100, and the same equipment on the same lease costs $200 for a customer on renewal because they've rolled him over and he's got another 60 months, five years to pay, you've got a separate market. That group of buyers is effectively eliminated from the competitive marketplace. They don't have that as a suitable alternative. Price elasticity. Why would anybody, price elasticity means if I'm paying too much, I'm going somewhere else. Why would 80% of the customers facing that stay? Market power. The price discrimination. If you're discriminating between two groups, it means one group can be isolated. You're discriminating between the new purchasers and the old purchasers. You've got price discrimination. Hold on. I can't let you re-argue the whole case. Okay. We've gone almost half again, as much as your total allotted time. So unless my colleagues have additional questions, I'd better move us on to the next case. Okay. Thank you, counsel. Thank you, Your Honor. New Cal v. ICON is submitted. Thank you.
judges: Kleinfeld, Thomas, Burgess